EVA SEALS, Respondent, v. A. E. WHITNEY et al., Appellants.

Kansas City Court of Appeals, May 4, 1908.

1. MINES AND MINING: Negligence: Place of Work: Powder Gas: Evidence. In an action for the death of a miner caused by powder gas it is held on the evidence that it was a question for the jury whether the failure to ventilate the shaft after the shot and the failure to warn the deceased of the presence of the gas in the shaft, were the proximate causes of the death, since in all occupations attended with great or unusual danger there must be used all readily attainable appliances known to science for the prevention of accidents.

2. ――――: ――――: ――――: ――――: ――――: Contributory Negligence. Where a miner is sent to the bottom of a shaft to remove the debris from a shot he is not guilty of contributory negligence in doing the work thus assigned him, though it releases a deadly gas which kills him.

Appeal from Jasper Circuit Court.—*Hon. Howard Gray*, Judge.

AFFIRMED.

*Thomas Dolan* for appellant.

(1) Appellant contends that the earth and rock would confine the fumes of the powder, and that it would so remain until the earth was stirred up in the course of removing it. Much evidence was also to the effect that until the earth in which the powder fumes was confined was stirred up and the fumes liberated into the atmosphere, that an air sail would be of no use as it could not remove the fumes. The sail could only remove fumes that permeated the atmosphere of the shaft, but it was shown that during the interval between Saturday evening and Monday morning all the powder fumes in the atmosphere of the shaft would have gone out of it without a sail. (2) Appellants accordingly asked the court to instruct the jury as follows: "The jury are instructed that unless you believe from the evidence that the powder gases which would be mingled with the earth and rock at the bottom of the shaft, permeating the same, could be removed by a sail without stirring same up, the defendants cannot be held to be negligent in not putting in a sail whether it was the custom to do so or not, and your verdict should be for the defendants. The court refused to so instruct the jury. Appellant claims this was error. Christy v. Hughes, 24 Mo. App. 275; Saxton v. Railroad, 98 Mo. App. 495. (3) From all the testimony, it appears that a reasonably prudent man could not have anticipated any accident from the manner in which the work was conducted as to the time of putting the sail into the shaft. This is the test of negligence; if a reasonably prudent man could not have anticipated the happening, there is no negligence. Nolan v. Shickle, 3 Mo. App. 300; Hisle v. Swift, 78 Mo. App. 39; Boyd v. Graham, 5 Mo. App. 403; Lawless v. Gas Light Co., 72 Mo. App. 679; Stone v. Hunt, 94 Mo. 475; Rickaly v. Boiler Works Co., 108 Mo. App. 130; Glasscock v.

Dry Goods Co., 106 Mo. App. 657; Moberly v. Railroad, 17 Mo. App. 535; Warner v. Railway, 178 Mo. 134.

*Horace Ruark, Thomas M. Saxton* and *McReynolds & Halliburton* for respondent.

(1) The duty of the employer to furnish the employee at all times a reasonably safe place in which to do the work required of him is not only enjoined by the law governing employer and employee, but is also imposed upon the employer as owner of the premises by the general law for the safety of all persons thereon. Musick v. Packing Co., 58 Mo. App. 329; Zellars v. Water & Light Co., 92 Mo. App. 117. (2) And is required not to expose his servant to needless hazard as to the place where the work is prosecuted or the manner of its performance, and whether it be machinery the servant is to apply, or whether it be the place or the manner of doing the work, it is the duty of the master to carefully protect the servant. Halliburton v. Railroad, 58 Mo. App. 33; Knight v. Lead & Zinc Co., 57 Mo. App. 541, 91 Mo. App. 574. (3) It is the duty of the master to protect his servant against dangers which the master might have anticipated by the exercise of ordinary care as well as against those known to him. Rogers v. Printing Co., 103 Mo. App. 683. (4) It is the duty of the master to warn and instruct his servants as to defects and dangers of which he knows, or ought in the exercise of reasonable care and diligence to know, and of which the servant has no knowledge actual or constructive. 26 Cyc. 1165, par. D and note 97, p. 1166; Deweese v. Manufacturing Co., 128 Mo. 423; Deweese v. Manufacturing Co., 54 Mo. App. 476; Rodney v. Railroad, 127 Mo. 689; Dowling v. Allen, 74 Mo. 16; Hysell v. Swift, etc., Co., 78 Mo. App. 44; Girard v. Wheel Co., 46 Mo. App. 110; Nickell v. Paper Stock Co., 95 Mo. App. 231. (5) Independent of statute it is held that it is the duty of mine employer to warn and it is negligence for the master

to fail to warn a servant unacquainted with the fact, that a mine contains impure air or gas, and the master is responsible in damages for failure to perform this duty in case injury results. White, Personal Injuries in Mines, sec. 373; Strahlendorf v. Rosenthal, 30 Wis. 674; Stone Co. v. Mooney, 61 N. J. L. 263; Coal Co. v. Phillips, 39 Ill. App. 376; Musgrave v. Coal Co. (Iowa), 61 N. W. 227; Coal Co. v. Berberick, 94 Fed. 329; Gold Mining Co. v. Flaherty, 111 Fed. 312; Coal & Mining Co. v. Jones, 87 S. W. 440; Andricus v. Coal Co., 90 S. W. 233; Welch v. Iron Works, 57 Atl. 88.

JOHNSON, J.—Plaintiff sues for damages for the death of her husband which she alleges was caused by the negligence of defendants, mining partners. The principal questions urged on our attention by defendants, who brought the cause here by appeal, arise from the contention that at the close of the evidence, the jury should have been directed by the court to return a verdict in their favor.

The facts presented by the evidence introduced by plaintiff are as follows: Monday morning, August 20, 1906, plaintiff's husband, Jesse Seals and her brother, Shed Shuey, were employed by defendants to work as miners in sinking a prospect shaft in mining land owned by defendants in Newton county. Seals was twenty years old, Shuey twenty-eight. Both were practical miners and neither had worked in that shaft before. The shaft was sixty-eight feet deep and had penetrated into hard rock which, to be properly loosened, required explosions of heavy charges of dynamite. The last work done on the preceding Saturday was the firing of a shot of such character in the bottom of the shaft. Between that event and the time when Seals and Shuey were ordered by defendant, Whitney, the superintendent of the mine, to go down in the shaft, no effort was made to remove the noxious gases liberated

by the explosion. The men did not know when the last shot had been fired, but before going down into the shaft, Shuey asked Whitney, in the presence of Seals, if he had "ever been bothered with air" (meaning poisonous gases). Whitney replied he had not. Thus assured, the men descended to the bottom and began the work of loading the tub with the materials to be removed. Whitney stationed himself at the top and performed the duties of hoister. The hoist was operated by horsepower and the tub used was small and shallow, about fourteen inches deep. A recent rain had caused some surface water to collect in the bottom of the shaft. Shuey first went down and, while descending, lighted matches to test the air, and found they would burn. He did not detect the presence of any foul gas and set to work filling the tub with water and sending it to the top. After the third load had been sent up, Seals came down, and they filled the tub partly with water and partly with solid substance. At this time, Shuey first felt the effects of poisonous gas and immediately called up to Whitney to send down the "sail"—a ventilating apparatus consisting of a canvas pipe eight or ten inches in diameter, designed to extend from the top to the bottom of the shaft and to set the air to circulating by means of a burning lamp placed in the bottom end of the pipe. Shuey expected to send away the noxious vapor by this device. Whitney promptly lowered the "sail" and Shuey lighted the lamp. Then he said to Seals, "You get in and go up when the tub comes down; I'm all in." Seals replied, "I am, too," and sat down. At this, Shuey became unconscious. Obtaining no response to his calls to the men and hearing them breathing hard, Whitney became concerned for their safety and raised an alarm. Miners gathered and one of them volunteered to attempt a rescue. He was lowered in the tub to the bottom, found Seals unconscious, placed him in the tub and started

up with him, but when about half of the ascent had been accomplished, the unconscious man was seized with a convulsive spasm (called by the miners a "strut"), and fell to the bottom. The would-be rescuer, himself affected by the poison, went on to the top. A larger tub was procured and another miner went down. First, he brought up Shuey, who was still living, and who finally recovered, and then returned and brought up the dead body of Seals.

It is conceded that Seals and Shuey were overcome by inhaling poisonous gas which both parties appear to think was generated by the explosion and, therefore, was not what the miners ordinarily call "bad air" (carbonic acid gas). The witnesses say that where the latter gas is present in sufficient quantity to destroy human life, it will extinguish combustion immediately, and the fact that the matches and lamp would burn is convincing that the gas the men inhaled was the product of powder, since such gas may exist in deadly quantity and still the air with which it is mixed will support combustion. Unlike carbonic acid gas, its presence ordinarily will be disclosed by its odor and the effect on a person inhaling it. That it was not detected by Seals and Shuey in the present instance in time for them to escape from the shaft probably was due to the fact that when Shuey first began to work, the air surrounding him was not impregnated with a dangerous quantity, and it was not until he and Seals had removed the water and begun to stir the loosened rock and dirt that enough gas was mingled with the air to be dangerous to life. Owing to the great force exerted downward from an explosion of dynamite, the witnesses say that the usual result of such explosion is strongly to permeate the loosened substance with the gas engendered and that such gas will be held imprisoned until released by disturbance of the material in which it

is confined. Further, it is said that such gas is heavier than air and when liberated in the bottom of a shaft, will remain there until drawn out by ventilation. Some of the witnesses introduced by plaintiff add that gas thus suffered to remain will continue to work its way downward into the pile of loosened material. It is shown by plaintiffs that on two former occasions, men had been driven out of the shaft by the presence therein of excessive powder gas and that on account of the hardness of the rock and the consequent necessity of using heavy charges of explosives, the bottom of the shaft was likely to be dangerously filled with gas after each explosion. These facts were known to the superintendent but not to Seals and Shuey who, as stated, were strangers to the shaft and unfamiliar with its peculiar characteristics.

The specific acts of negligence pleaded and submitted to the jury in the instructions given at the instance of plaintiff, thus may be stated: First, the failure to use the ventilator immediately after the shot was fired; second, the failure to have it in operation immediately before and during the time the men were at work; third, the omission to warn the men of the likelihood of gas being present in sufficient quantity to endanger their safety.

The argument of defendants on the demurrer to the evidence contains two main propositions: (1) That no negligence of defendants is shown by the facts stated to be the proximate cause of the death of plaintiff's husband. (2) That his own negligence in liberating the destructive gas by stirring up the dirt and rock where it was imprisoned and in not leaving the shaft immediately on discovering its presence was the proximate, or at least, a contributing cause of his death. The first of these propositions must be resolved against the contention of defendants. The master's duty to his servant to employ ordinary care to provide

the servant with a reasonably safe place in which to work calls for the use of all reasonable means to obviate dangers known to the master to exist in the place where he sends his servant, or which would be known to an ordinarily careful and prudent person in the situation of the master and in the exercise of reasonable care. "Occupations, however important, which cannot be conducted without necessary danger to life, body, or limb, should not be prosecuted at all without all reasonable precautions against such dangers afforded by science. The necessary danger attending them should operate as a prohibition to their pursuit without such safeguards. Indeed, we think it may be laid down as a legal principle that in all occupations which are attended with great and unusual danger there must be used all appliances readily attainable, known to science, for the prevention of accidents, and that the neglect to provide such readily attainable appliances will be regarded as proof of culpable negligence." [Mather v. Rillston, 156 U. S. 391; Western Coal & Mining Co. v. Berberich, 94 Fed. Rep. 329.]

With knowledge actual or imputed of the fact that a subtle and dangerous foe to human life might be lying concealed in the bottom of the shaft, and with means for driving it out available and actually at hand, defendants' remissness in failing to employ such means can appear in no other light than as a culpable breach of their duty to their servant. It is a fair inference to say that had the "sail" been operated immediately after the explosion, enough of the gas would have been withdrawn to prevent the pile of loose rock from becoming the lurking place of a dangerous quantity and the conclusion is irresistible that had the "sail" been placed in position on Monday morning, before the men went down, it would have removed at once the gas overlying the water and would have carried off the gas afterward released by the stirring of the loose rock and

dirt. The jury were entitled to draw these inferences from the facts and circumstances in evidence, and we pass to the consideration of the omission of defendant's superintendent to warn the men of the likelihood of the existence of danger from gas in the shaft. Possessing knowledge of facts from which a reasonable man would anticipate that danger might be present, it was the imperative duty of Whitney to give the men warning of what they might expect to encounter in order that they might have opportunity either to refuse to meet the danger or to be on their guard against it. The statement of Whitney that he had not been bothered by "bad air" was an assurance that the place was safe and that he had employed reasonable care to make it safe. Giving such assurance recklessly, as the evidence of plaintiff shows was done, was actionable negligence. It was for the jury to decide whether these negligent acts, viz., the failure to ventilate the shaft and the failure to warn the men were the proximate cause of the death of Seals, since we perceive no reason to declare, as a matter of law, that there is any break in the connection between these acts and their disastrous result.

On the second proposition, it is urged by defendants that Seals himself released his enemy and, therefore, must be held in law to have been negligent. This is not so. Seals was engaged in the very work his master bade him do. Had the master performed his duty, the enemy would not have been there and the servant could have worked in safety. He had the right to rely on his master's assurance and was not charged with any duty to save himself until he knew, or in the exercise of reasonable care, should have known, that the master had been derelict and had sent him into danger. Manifestly, Seals did not know of the presence of gas until the water had been removed and the pile of dirt and rock had been opened. The tub then had been loaded and started upward and no means of escape remained.

Grocery Co. v. Fidelity & Guaranty Co.

The men were stricken so suddenly that they had no opportunity to escape. The jury had a right to consider these reasonable inferences and the question of contributory negligence must be held to have been an issue of fact to go to the jury. The following authorities sustain the view of the law expressed in what we have said: Musick v. Packing Co., 58 Mo. App. 322; Zellars v. Water Co., 92 Mo. App. 107; Deweese v. Mining Co., 54 Mo. App. 476; Halliburton v. Railway, 58 Mo. App. 27; Rodney v. Railroad, 127 Mo. 676; Gibson v. Bridge Co., 112 Mo. App. 594; White's Mines & Mining Remedies, sec. 462; Strahlendorf v. Rosenthal, 30 Wis. 674; Belleville Stone Co. v. Mooney, 61 N. J. L. 263; Musgrave v. Coal Co., 61 N. W. 227; Portland Gold Mining Co. v. Flaherty, 111 Fed. 312; Western Coal & Mining Co. v. Jones, 87 S. W. 440; Andricus v. Pineville Coal Co., 90 S. W. 233; Welch v. Bath Iron Works, 57 Atl. 88.

A careful inspection of the record convinces us that the case was fairly tried and submitted and that the judgment is for the right party. Accordingly, it is affirmed. All concur.